UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARIA ALICEA<br>    *Plaintiff*, | )    CASE NO. 3:21-CV-01147 (KAD)<br>)<br>) |
| v. | )<br>) |
| CITY OF BRIDGEPORT, ET AL.<br>    *Defendants*. | )    SEPTEMBER 11, 2023<br>) |

<u>**MEMORANDUM OF DECISION**</u>
**RE: MOTION FOR SUMMARY JUDGMENT (ECF NO. 90)**

Kari A. Dooley, United States District Judge:

On August 27, 2021, Plaintiff Maria Alicea commenced this action against the City of Bridgeport, the Bridgeport Police Department, and Officers Rivera, Granello, Swix, Laracuente, and Cruz (the "Officer Defendants") (collectively, "the Defendants"), alleging that the Defendants violated her First, Fourth, and Thirteenth Amendment rights. Her complaint arises from events which occurred on July 3, 2020, when, in response to a call from a family member, officers from the Bridgeport Police Department were dispatched to conduct a wellness check on Plaintiff at her residence in Bridgeport, Connecticut. Over the course of the wellness check, Plaintiff became increasingly emotionally dysregulated and agitated, eventually jumping out of a second-story window and sustaining multiple injuries. After the Court dismissed several of her claims, only Plaintiff's Fourth Amendment claims brought pursuant to 42 U.S.C. § 1983 against the Officer Defendants remain. Pending before the Court is the Officer Defendants' motion for summary judgment on the remaining Fourth Amendment claims. Notably, the entire interaction between the Officer Defendants and Plaintiff was captured on the body cameras of the responding officers. A review of these audio and video recordings reveals a much different story than the narrative set

forth in Plaintiff's Complaint. So for the reasons that follow, the motion for summary judgment, ECF No. 90, is GRANTED.

**STANDARD OF REVIEW**

**Summary Judgement**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense . . . ." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation," but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented party's papers "liberally" and "interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (quotation marks omitted), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**Qualified Immunity**

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity would be denied to an official only if (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official and (2) the right was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). The district court has the discretion to determine, considering the circumstances surrounding the case, which of the two prongs of the qualified immunity standard to address first. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Pearson*, 555 U.S. at 236).

Qualified immunity "affords government officials 'breathing room' to make reasonable— even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

**FACTS AND PROCEDURAL HISTORY**[1]

On July 3, 2020, the Bridgeport Emergency Dispatch Center received a 911 call from Plaintiff's daughter, Denaysia Gumbs, requesting police assistance for her mother, who she described as "unstable and delusional," to help take her to the hospital. *See* Defs.' LRS ¶ 1. Following the call, the Dispatch Center requested an ambulance to Plaintiff's residence—an apartment in an apartment complex in Bridgeport, Connecticut -- to conduct a welfare check. *Id.* ¶ 2. Officers Swix and Rivera of the Bridgeport Police Department were also dispatched to the residence to assist with a welfare check of a person with "52 issues."[2] *See id.* ¶ 3. "52 issues" is a Bridgeport Police Department code describing a person "exhibiting unusual emotional or psychological behavior." *Id.* ¶ 4.

When the Officers first arrived at Plaintiff's apartment complex, they spoke to Plaintiff's daughters, Denaysia Gumbs and Nyasia Alicea, in the parking lot of the complex. *Id.* ¶ 5. Plaintiff's daughters told the Officers that Plaintiff had been verbally aggressive and acting unlike

---

[1] The facts are taken from Plaintiff's verified Complaint and from Defendants' Local Rule 56(a) Statement and supporting exhibits. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes . . . ."); Defs.' Statement of Material Facts ("Defs.' LRS"), ECF No. 90-2. Local Rule 56(a)2 requires the party opposing summary judgment to submit a statement containing separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. Each denial must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)3. Defendants originally filed the instant motion on August 1, 2022, at which time Plaintiff's interlocutory appeal of the Court's Order granting Defendants' motion to dismiss was pending before the Second Circuit. *See* Order, ECF No. 84; Notice of Interlocutory Appeal, ECF No. 86. Plaintiff did not respond to Defendants' motion for summary judgment while that appeal was pending. When the Second Circuit dismissed Plaintiff's interlocutory appeal on January 12, 2023, this Court issued an order directing Plaintiff to respond to Defendants' motion for summary judgment on or before February 13, 2023. *See* Order, ECF No. 98. To date, Plaintiff has not submitted any opposition to Defendants' motion. Accordingly, the Defendants' facts are deemed admitted to the extent that they are supported by the record. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2"); *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (noting that well-supported factual allegations set forth in a defendant's Rule 56(a)1 statement will be deemed admitted where a plaintiff fails to respond). Notably, most of Defendants' factual assertions derive directly from the Officers' body camera footage, which the Court has reviewed.

[2] The Court may accept as true facts that are supported by video footage. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

they had ever seen before, and that they were concerned for her wellbeing. *Id.* ¶ 7. Ms. Gumbs stated that she lives with Plaintiff and was afraid to be in the residence with Plaintiff. *Id.* ¶ 8. The Officers inquired as to what the objective of the visit was, and Ms. Gumbs stated that she would like to obtain her belongings from the residence and would also like the Officers to check on Plaintiff's wellbeing. *See* Defs.' Ex. E at 13:25-13:26 (manually filed at ECF No. 94).

The Officers and a paramedic, accompanied by Ms. Gumbs, proceeded to Plaintiff's loft apartment, which was on the second floor of the complex with an exterior-facing front door leading to an outside walkway which extended the length of the building and served as an access way to the second floor apartments. *Id.* at 13:26-13:27; Defs. Ex. F at 13:30-13:31. Ms. Gumbs knocked on the front door, and eventually Plaintiff's husband, Ramon Rios-Torres, came to the door. *Id.* at 13:31:13-13:35:24. Mr. Rios-Torres opened the door wide, said little (if anything), then walked away from the door into the apartment.[3] Ms. Gumbs entered the apartment and the Officers and paramedic followed, standing just slightly past the threshold to the apartment, while Mr. Rios-Torres walked into the bedroom. Defs.' Ex. E at 13:33:28-13:33:43. Plaintiff immediately began shouting at the Officers from the bedroom, where she could be heard but not seen by the Officers, stating "police need to leave if you don't have a warrant" and "this is my sanctuary." Defs.' LRS ¶ 11. The Officers and paramedic immediately complied and exited the residence. *Id.* ¶ 12. The Officers' body camera footage reveals that they were inside of the apartment for approximately 28 seconds.

Once outside the residence, the Officers and paramedic spoke to Ms. Gumbs and told her that there was nothing that they could do for Plaintiff because they had been told to leave and

---

[3] As discussed *infra* p. 11, the parties dispute whether Mr. Rios-Torres gave the Officers permission to enter the apartment. Defendants claim that "[t]he officers were allowed to enter the apartment by Ms. Alicea's husband," Defs.' LRS ¶ 10, while Plaintiff alleges that the Officers entered "without permission," Compl. at 4.

Plaintiff did not appear to be a threat to herself or others. *See* Defs.' Ex. F at 13:36:44-13:38:14. During this conversation, Plaintiff could be heard yelling inside of the residence. Mr. Rios-Torres exited the apartment and Officers attempted to speak with him, during which Plaintiff became agitated and started banging on the window. Defs.' LRS ¶ 13. Plaintiff came to the door of the apartment and began referring to the Officers and paramedics as "zombies" and shouting obscenities at them. *Id.* ¶ 14. The Officers began walking away from the residence to allow Plaintiff to calm down. Defs.' Ex. F at 13:39:22-13:39:34.[4] Plaintiff then began throwing glass and other items at the Officers through an open window from inside the apartment. Defs. LRS ¶ 15.

Plaintiff became increasingly agitated and leaned out of the window topless and shouting obscenities. *Id.* ¶ 17. Mr. Rios-Torres went to the window to attempt to calm Plaintiff down, and Plaintiff began using a long stick-like object in a stabbing motion towards Mr. Rios-Torres. *Id.* ¶¶ 18–19. At that point, the Officers walked back to the window in an attempt to calm Plaintiff down. *Id.* ¶ 20. The Officers attempted to explain to Plaintiff that they were only there to help, but Plaintiff, still agitated, continued shouting obscenities at them. *Id.* ¶¶ 21–22. Officer Swix thereafter radioed Dispatch to request additional assistance. *Id.* ¶ 23.

Officers Cruz and Laracuente and Sergeant Granello responded to the call for additional assistance, and when Sergeant Granello arrived, Officer Swix briefed him on the situation. *Id.* ¶¶ 24–25. When the additional officers arrived, Plaintiff was continuing to shout obscenities and throwing things from her apartment. *Id.* ¶ 26. Sergeant Granello therefore instructed Dispatch to contact the Bridgeport Fire Department to seek help gaining access to the apartment. *Id.* ¶ 27. Plaintiff continued to become increasingly more agitated, eventually removing all of her clothing and walking in and out of her apartment several times, bringing out furniture and throwing

---

[4] While Defendants state that Plaintiff began throwing items at the Officers before they had begun walking away, Defs. LRS ¶¶ 14-16, the video footage shows that she began throwing items after they had begun walking away.

miscellaneous objects at the Officers. *Id.* ¶¶ 25–33. Officers' attempts to calm Plaintiff were unavailing. *See id.*

After smashing a college diploma in a glass frame and scattering the glass around the concrete floor outside of her apartment door, Plaintiff entered the apartment, locked the door, and barricaded it with a kitchen table and chair. *Id.* ¶¶ 32–33, 37. She stated that if the Officers entered the apartment, she would kill them. *Id.* ¶ 34. The Officers determined that Plaintiff needed to be transported to the hospital for an evaluation based on their concern for her safety. *See id.* ¶ 27. Upon arrival of the Bridgeport Fire Department, Officer Granello directed them to force open the door. *Id.* ¶ 36. Plaintiff was not in the main area of the apartment when the Officers entered, and they believed Plaintiff would be found in the main bedroom, which was barricaded by a large dresser. *Id.* ¶¶ 37–42.

Plaintiff was not in the main bedroom when the Officers were able to gain access to it, but the screen from the window was pushed out. *Id.* ¶¶ 42–43. The Officers learned that Plaintiff had jumped out of the window and ran around to the other side of the building to get to her. *Id.* ¶¶ 45–46. There, they observed Plaintiff lying face down on the ground. *Id.* ¶ 47. Medics began treating Plaintiff, who was then transported to Bridgeport Hospital where it was confirmed that Plaintiff sustained numerous non-life-threatening injuries. *Id.* ¶¶ 48–51.

Over a year later, on August 10, 2021, Plaintiff filed the instant action against the City of Bridgeport, Bridgeport Police Department, Sergeant Granello, and Officers Swix, Rivera, Cruz, and Laracuente in the Connecticut Superior Court. Those Defendants removed the case to federal court on August 27, 2021. *See* Notice of Removal, ECF No. 1. With leave of Court, Plaintiff filed the operative Second Amended Complaint on December 20, 2021. *See* Second Am. Compl. Therein, Plaintiff brought claims pursuant to 42 U.S.C. § 1983, alleging, *inter alia,* that the

Defendants violated her Fourth Amendment right to be free from unreasonable searches and seizures. *See* Second Am. Compl. at 4–7.[5]

Now pending before the Court is Defendants' motion for summary judgment on the Fourth Amendment claim, ECF No. 90.

**DISCUSSION**

Section 1983 of Title 42 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." "The common elements to all § 1983 claims are: '(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Lee v. City of Troy*, 520 F. Supp. 3d 191, 205 (N.D.N.Y. 2021) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). Further, a plaintiff seeking monetary damages from a defendant must allege facts that establish the personal involvement of that defendant in the alleged constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983'" (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991))). To "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020).

---

[5] As discussed above, all other claims were dismissed. *See* Order Granting Mot. to Dismiss at 7, ECF No. 84.

Plaintiff's remaining Fourth Amendment claims against the Defendants arise from Plaintiff's allegations that the Defendants entered her residence without consent, reentered the residence after breaking down her front door, caused her to jump from her window and sustain multiple injuries, and then took her to the hospital for evaluation without her consent. The Court construes Plaintiff's Complaint as asserting Fourth Amendment claims based on the Defendants' allegedly unconstitutional entry into and search of her home and seizure of her person, and the Defendants' alleged excessive force in carrying out the search and seizure. Defendants move for summary judgment arguing that no violation of the Fourth Amendment occurred or alternatively that they are entitled to qualified immunity. Def.'s Mot. for Summ. J. at 2, ECF No. 90. The Court agrees with Defendants.

**Fourth Amendment**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see Terry v. Ohio*, 392 U.S. 1, 9 (1968) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures" (internal citation and quotation marks omitted)). "It is well established that 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *United States v. U.S. District Court*, 407 U.S. 297, 313 (1972). "The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014). However, "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" and therefore "the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). "A person has been 'seized' within the meaning of the Fourth Amendment when an 'officer, by means of physical force or show of authority, . . . in some way restrain[s] the liberty

of a citizen.'" *Edrei v. City of New York*, 254 F. Supp. 3d 565, 573 (S.D.N.Y. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)), *aff'd sub nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018). In other words, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Although not clearly set out in Plaintiff's Complaint, the Court construes the Complaint liberally and identifies three possible events which could plausibly support a Fourth Amendment claim for an unconstitutional search and seizure: 1) the Officers' initial entry into Plaintiff's apartment, 2) the Officers' re-entry into Plaintiff's apartment after Plaintiff barricaded herself inside, and 3) the taking of Plaintiff to the hospital for evaluation.[6]

### *Initial Entry*

Plaintiff first appears to allege that Defendants violated the Fourth Amendment when they first entered her apartment without her consent at the beginning of the wellness check. *See* Second Am. Compl. at 4. Defendants assert that their initial entry into Plaintiff's apartment was not a violation of Plaintiff's Fourth Amendment rights because they entered with Mr. Rios-Torres' consent. *See* Defs.' Mem. in Supp. at 14, ECF No. 90-1.

---

[6] Plaintiff also appears to assert a Fourth Amendment violation based on Defendants' continued presence outside of her apartment but within the "gated private community." *See* Second Am. Compl. at 5. To the extent that Plaintiff intended to advance such a claim, it cannot succeed as Plaintiff did not have a reasonable expectation of privacy in the outside public areas of her apartment complex, and therefore her rights were not and could not be violated by the Officers' mere presence within the complex. *See Wilson v. Sessoms-Newton*, No. 14-CV-00106 (PKC), 2017 WL 3575240, at *5 (E.D.N.Y. Aug. 17, 2017) ("[T]he Supreme Court has 'uniformly [] held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action'" (quoting *El-Nahal v. Yassky*, 835 F.3d 248, 253 n.2 (2d Cir. 2016))); *United States v. Simmonds*, 641 F. App'x 99, 104 (2d Cir. 2016) (summary order) ("We have held that a person does not have a reasonable expectation of privacy in the common areas of multi-unit buildings."). *But see United States v. Lewis*, 62 F.4th 733, 738–44 (2d Cir. 2023) (rejecting categorical rule that a person *never* has a reasonable expectation of privacy in the common areas of a multi-unit building, but finding that, under the individualized facts of the case, that the back porch of a three-story apartment building that was accessible by a common stairwell was a common area in which the defendant did not have a reasonable expectation of privacy).

One exception to the warrant requirement is consent, pursuant to which warrantless entry is "permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent." *United States v. Guerrero*, 813 F.3d 462, 467 (2d Cir. 2016). The "[d]etermination of whether such an individual has so consented requires a fact-based inquiry that considers the totality of all the circumstances." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018). Moreover, "[c]onsent may be express or implied," *id.*, and "[i]t is well-settled that consent may be inferred from an individual's words, gestures, or conduct." *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010) (summary order) (quoting *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981)). "The Fourth Amendment is satisfied when an officer's belief that consent authorized an entry was, under the circumstances, objectively reasonable." *United States v. Hernandez*, No. 19-CR-0097 (VM), 2020 WL 3257937, at *11 (S.D.N.Y. June 16, 2020) (citing *United States v. O'Brien*, 926 F.3d 57, 76–77 (2d Cir. 2019)).

Here, although the parties dispute whether Mr. Rios-Torres verbally gave the Defendants consent to enter the apartment, a dispute not resolved through the audio and video recording, it was objectively reasonable for the Defendants to believe that they had consent to enter given Mr. Rios-Torres's actions. Indeed, the video does not allow for a contrary conclusion. Mr. Rios-Torres opened the door after Ms. Gumbs knocked, saw the Defendants standing outside with Ms. Gumbs, and after engaging briefly with Ms. Gumbs, he opened the door wide enough for Ms. Gumbs and the Officers to enter the apartment while simultaneously walking away from the door as everyone entered. *Cf. United States v. Goncalves*, 5:07-CR-257 (NAM), 2008 WL 2080550, at *8 (N.D.N.Y. May 15, 2008) (finding implied consent to enter a home to locate the defendant where the defendant's wife, "in response to [the officer's] inquiry as to where defendant was, stated that defendant was inside, turned around and entered the house without further explanation or

11

instruction, and left the doors open behind her"); *United States v. Beardsley*, No. 1:20-CR-12 (RJA) (MJR), 2022 WL 18812425, at *12 (W.D.N.Y. Sept. 23, 2022), *report and recommendation adopted sub nom. United States v. Adams*, No. 20-CR-12, 2023 WL 2142148 (W.D.N.Y. Feb. 21, 2023) (similar). After the Officers followed Mr. Rios-Torres into the apartment and stood in the entryway, Mr. Rios-Torres did not object or even comment upon their presence in the apartment. *Cf. Grant*, 375 F. App'x at 80 (affirming the district court's finding of implied consent to enter and search an apartment where officers approached the defendant and identified themselves as police, and the defendant "responded to the identification and request to talk by admitting the officers into the building and turning toward his apartment. . . . without impediment or objection to the entry of police"). And, upon Plaintiff's objection to the Officers' presence in the apartment, they immediately exited—being in the apartment for only a total of 28 seconds.

Under these circumstances, there is no genuine issue of material fact as to whether the Officers' entry into the home violated the Fourth Amendment. It did not. It was objectively reasonable for the Officers to believe that they had received consent to enter the apartment. *See Hernandez*, 2020 WL 3257937, at *11.

### *Re-Entry*

Plaintiff also alleges that Defendants violated her Fourth Amendment rights by instructing the Bridgeport Fire Department to forcibly open her door and thereafter by reentering her apartment. *See* Second Am. Compl. at 4. Defendants argue that their reentry into Plaintiff's

apartment did not violate the Fourth Amendment because it was done pursuant to the emergency aid exception to the Fourth Amendment's warrant requirement.[7] *See* Defs.' Mem. in Supp. at 14.

Courts have oft recognized that "the exigencies of [a] situation [may] make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–394 (1978)). One such exigency is "the need to assist persons who are seriously injured or threatened with such injury." *Id.* (quoting *Brigham City*, 547 U.S. at 403). Thus, pursuant to the emergency aid exception, "law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Id.* (quoting *Brigham City*, 547 U.S. at 403). "The inquiry is not whether the officer subjectively believed that an occupant needed help[,] [r]ather, the dispositive question is simply 'whether there was "an objectively reasonable basis for believing" that medical assistance was needed, or persons were in danger.'" *Batt v. Buccilli*, 725 F. App'x 23, 25–26 (2d Cir. 2018) (quoting *Fisher*, 558 U.S. at 49).

Here, the video footage conclusively establishes that the Officers had an objectively reasonable basis for believing that Plaintiff was in need of medical assistance and that Plaintiff was in danger due to Plaintiff's then present emotional state. The Officers were originally dispatched to the premises because Ms. Gumbs had indicated that Plaintiff was "delusional and unsafe to be around." *See* Defs.' LRS ¶ 2. After initially being asked to leave Plaintiff's apartment, the Officers walked away, intending to leave the premises. The Officers only reengaged with Plaintiff when she began thrusting a pointed object in a stabbing motion at Mr. Rios-Torres and

---

[7] Defendants also contend that their reentry was permissible under the "community caretaking" exception. However, the Supreme Court has rejected the extension of the community caretaking exception, which was developed from the Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. 433 (1973), from the searches of vehicles to the searches of homes. *See Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021); *see also Torcivia v. Suffolk Cnty., N.Y.* 17 F.4th 342, 358 n.25 (2d Cir. 2021).

when she began throwing objects outside of her apartment. By the time the Officers made the decision to reenter Plaintiff's apartment, she had stripped naked and begun screaming profanities loudly at the Officers and throwing miscellaneous items at them. She had violently shattered a glass frame and had scattered the glass around the outside of her apartment before barricading herself inside. In short, Plaintiff appears in the video as a person in real crisis.[8]  Under these circumstances, it was objectively reasonable for the Officers to believe that Plaintiff was in need of immediate mental health care and that she may have been in imminent danger.[9] The emergency aid exception to the Fourth Amendment warrant requirement applied and no Fourth Amendment violation occurred when the Offices reentered the apartment.

Plaintiff also appears to allege that Defendants violated her Fourth Amendment rights by forcibly opening her door in order to enter the apartment. She alleges that, "[d]uring a wellness check the only time a door can be broken down is if the person upon the initial contact of said unit/dwelling the person doesn't answer the door then in belief that the person is dead or impaired to come to the door, the officers with fire department assistance can break in." Second Am. Compl. at 7. Plaintiff misapprehends the law. Under the emergency aid exception, the manner by which the search is executed must also be objectively reasonable. *United States v. Snipe,* 515 F.3d 947, 952 (9th Cir. 2008); *see also Brigham City,* 547 U.S. at 406–07 (examining whether "[t]he manner of the officers' entry was also reasonable" under the emergency aid exception); *Fisher,* 558 U.S. at 548-549 (finding no Fourth Amendment violation where officers forced entry into a home in which the occupant had barricaded himself and in which they could see the occupant "screaming

---

[8] In making these types of observations, it is not the Court's intent to be disrespectful towards Plaintiff or her claims or to criticize her for her behavior on the day in question. The Court must assess the Officers' conduct and describing the situation with which they were confronted is a necessary part of the assessment.
[9] Unfortunately, the Officers' assessment proved accurate. Not long after the Officers reentered the apartment, Plaintiff jumped out of a second-story window, sustaining several injuries.

14

and throwing things"). Here, Plaintiff had barricaded the door to the only entrance. Therefore, the only reasonable manner by which to gain entry was by the force employed and using such force did not violate the Fourth Amendment.[10]

### *Hospitalization*

Finally, although not clearly alleged, Plaintiff appears to advance a Fourth Amendment claim arising out of Defendants taking her into protective custody and transporting her to a hospital for medical care. *See* Second Am. Compl. at 4. Defendants argue that they did not violate the Fourth Amendment by taking Plaintiff into protective custody because they had probable cause to believe that Plaintiff posed a danger to herself or others. Defendants further argue that their actions were objectively reasonable, and that they therefore are entitled to qualified immunity. *See* Defs.' Mem. in Supp. at 15–16.

"A warrantless seizure for the purpose of involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others." *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (quoting *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993)). The Fourth Amendment requires a "'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Waananen v. Barry*, 343 F. Supp. 2d 161, 170 (D. Conn. 2004), *aff'd sub nom. Madsen v. Barry*, 160 F. App'x 102 (2d Cir. 2005) (quoting *Vallen v. Connelly*, 2004 WL 555698, No. 99-CV-9947 (SAS) (S.D.N.Y. 2004)).

---

[10] Even if the reentry into the apartment or the use of force to do so amounted to a Fourth Amendment violation, for reasons discussed above the Defendants would be entitled to qualified immunity insofar as it was objectively reasonable for the Officers to believe that entry into Plaintiff's apartment was not a violation of the Fourth Amendment. *See Pearson*, 555 U.S. at 244 (2009) ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law").

15

As discussed above, the video footage provides conclusive support for the Officers' assessment that there was probable cause to believe that Plaintiff posed a danger to herself or others. Indeed, Plaintiff had already exhibited self-injurious behavior at the time she was taken to the hospital—she had jumped from a second-story window and sustained multiple injuries.

Thus, the Court finds that there is no genuine dispute of material fact as to whether the Officers had probable cause to take Plaintiff into custody and therefore did not violate Plaintiff's Fourth Amendment rights in doing so.

### *Excessive Force*

Finally, Plaintiff asserts a Fourth Amendment claim for excessive force arising out of the July 3, 2020 incident.[11] *See* Second Am. Compl. at 7. Plaintiff does not, however, provide any facts in support of her excessive force claim, and the Court can discern none. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "However, it is also well established that law enforcement officers violate the Fourth Amendment if the amount of force they use is "objectively [un]reasonable" in light of the facts and circumstances confronting them.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (quoting *Graham*, 490 U.S. at 397). As discussed above, the Officers had probable cause to take Plaintiff into protective custody, and there is no indication from the body camera footage that the Officers or paramedics used any more force than was necessary to place Plaintiff onto a stretcher and then into the ambulance. Thus, no reasonable factfinder could find that Defendants exerted excessive force at any point during the July 3rd wellness check, and summary judgement is therefore granted as to those claims, if any, as well.

---

[11] To the extent an excessive force claim might derive from the forcible entry into the home, that argument is addressed above.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment, ECF No. 90, is GRANTED. The Clerk of the Court is directed to enter judgment in favor of the Defendants and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of September 2023.

                                       /s/ Kari A. Dooley
                                       KARI A. DOOLEY
                                       UNITED STATES DISTRICT JUDGE